# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| The Hartford Financial Services Group, Inc., | Case No. 0:12-cv-02133-MJD-JJG |
| Plaintiff, | **DEFENDANT SCOTT CARLSON'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |
| v. | |
| Scott Carlson, Kevin Corrigan, and Robert Cairns, | |
| Defendants. | |

Defendant Scott Carlson respectfully submits this Memorandum of Law in Opposition to Plaintiff The Hartford Financial Services, Inc.'s Motion for Temporary Restraining Order, Preliminary Injunction and Expedited Discovery (the "Motion").

## I.    OVERVIEW

The Hartford Financial Services, Inc.'s ("Hartford's") Complaint essentially claims Defendant Scott A. Carlson ("Carlson") stole confidential information at the conclusion of his employment and now refuses to give it back.  It claims that information is in the form of (a) emails sent to a home address, (b) files on a USB device, and (c) files uploaded to a cloud computing server called Redtail.  Hartford claims the situation is so dire that it must have immediate injunctive relief.

Hartford's claims are baseless.  This lawsuit is merely an attempt by Hartford to bully Carlson following his refusal to sign a restrictive non-solicitation undertaking that Hartford wanted him to sign.  Carlson refused to sign it, his employment ended, and he now works for another securities broker/dealer.  With this case, Hartford is retaliating.

Hartford's retaliation is obvious.  It sued Carlson despite the fact that:

1.     Carlson offered an affidavit confirming he searched for confidential information on any and all personal and work email addresses, any USB storage device, any home computer or hard drive, any other electronic storage device, and any other papers in his possession or control;

2.     Carlson offered to permanently delete, permanently destroy, return to Hartford, any confidential information that pertained to any Woodbury registered representatives;

3.     Carlson offered an affidavit that he will not retain or share, and has not knowingly retained or shared, any confidential information relating to Woodbury registered representatives with any other person or entity;

4.     Carlson offered to submit his computer and electronic devices for a third party forensic examination and even offered to pay for the examination himself.

Hartford rejected everything Carlson offered.   Now, it attempts to claim it faces "irreparable harm" even though Carlson (a) has none of the emails that were sent to a personal address, (b) has offered to return the USB device and delete anything on it that has to do with registered representatives, and (c) has deleted any registered representative information that was previously on Redtail.

Hartford faces no threat of irreparable harm.  It is not likely to win on the merits. The public interest is not served in any way by what Hartford is trying to do, and the resulting harm this is causing to Carlson is substantial.  Hartford's claims should be denied in their entirety and this case should be dismissed.

## II.    BACKGROUND FACTS

Carlson was previously employed as a Regional Vice-President of Woodbury Financial Services, Inc.  (Carlson Aff. ¶ 3).  His last day of employment at Woodbury was July 25, 2012.  (*Id*).  Carlson resigned his employment at Woodbury after he was told by Woodbury's Chief Executive Officer, Pat McEvoy, that he would not be able to maintain his position after a twenty year career at Woodbury unless he signed an addendum that would have imposed very restrictive non-solicitation requirements. (Carlson Aff. ¶ 4).  Carlson did not have a non-solicitation agreement with Woodbury during his twenty year employment.  (*Id*).  Carlson is currently employed at Questar Capital as a Divisional Vice-President.  (Carlson Aff. ¶ 3).

Throughout Hartford's Memorandum of Law, it repeatedly asserts that Carlson possesses confidential information in the form of emails sent to a home email address, files copied onto a USB device and files uploaded to a cloud computing storage provider called Redtail.  (Carlson Aff. ¶ 5).  Carlson has made numerous efforts to resolve Hartford's allegations and, among other things, assure it that he has deleted anything in his possession concerning emails sent to a home email address.  (Carlson Aff. ¶ 6).  For example, Carlson has informed Hartford that it will turn over the USB device.  (*Id*). Carlson has deleted any registered representative files stored on Redtail.  (*Id*).  Also, Hartford has cut off Carlson's access to Redtail entirely.  (*Id*).  Therefore, he cannot access anything on Redtail.  (*Id*).

Carlson has offered to let a third party do a forensic examination of his computer and any electronic storage devices.  (*Id*). Further and perhaps most important, Carlson has

also offered to give Hartford a written affidavit that states that he has returned any potentially confidential information, that he has not used it and he will not use it. (*Id*). Hartford has rejected each of these offers. (Carlson Aff. ¶ 7). Instead, Hartford is perpetuating this lawsuit to retaliate against him for leaving employment there and to interfere with Carlson's relationships even though it knows there is no "non-compete" agreement in place. (Carlson Aff. ¶ 8). It is doing this to hinder Carlson's further employment prospects, to cause him significant emotional distress, financial loss and loss of credibility with his current clients. (*Id*). This lawsuit has also limited Carlson's ability to be appointed to insurance companies and to obtain financing or credit at financial institutions. (*Id*). An injunction may require a disclosure on his securities license and also on any future appointments with insurance companies. (*Id*). Furthermore, it will likely impact relationships with new representatives and hinder his ability to make such relationships. (*Id*).

### A.   Alleged Confidential Information at Issue.

#### 1.   Emails to Home Address

Though Hartford characterizes as sinister Carlson's emailing of documents to a home address, it was a common at Woodbury for Regional Vice-Presidents to work at remote locations. (Carlson Aff. ¶ 9). Carlson worked primarily from his home in Nebraska or from a second home in Wisconsin. (*Id*). Emails and documents that were generated on Woodbury's computer system were unable to be printed unless the document was sent to a Woodbury printer at the Woodbury headquarters, or the printer at Carlson's home office in Nebraska. (Carlson Aff. ¶ 10). Carlson, as well as other

Regional Vice-Presidents, would routinely conduct work where it was occasionally necessary for them to print documents. (Carlson Aff. ¶ 11).

For example, Carlson would periodically review the approximately 100 sales representatives working under him in order to review their production performance and to supervise the nature and extent of their sales activities. (*Id*). He would print this data so that he could review their business and calculate his income, which was based solely on commissions. (*Id*). To print the documents, it was necessary to send the information to a personal email account. (*Id*).

Regarding calculating his income, printing the data was necessary to cross check Carlson's income for the following month. (*Id*). This cannot be done on a computer screen because by the time Carlson would receive his pay, the production data could change on the computer system, and often did in certain product lines, such as life insurance. (*Id*). Thus, it would be difficult, if not impossible, to cross check the data against the income received if Carlson, or another Regional Vice-President or Field Manager, did not have a hardcopy printout at month end. (*Id*).

In late July of 2012, while Carlson was in Wisconsin, he sent emails to his personal email account for these purposes. (Carlson Aff. ¶ 12). The following is a log of emails that Carlson sent to his home email address:

    a.    Email from Scott Carlson re Eagle Circle Ranking Manager Report;

    b.    Email from Scott Carlson with Rep contact information;

c.  Email from Scott Carlson re Year Over Year GDC with Trails Production for Territory 847;

d.  Email from Scott Carlson re List of Reps;

e.  Email from Scott Carlson re ms3;

f.  Email from Scott Carlson re Securities Registrations;

g.  Email from Scott Carlson re Hunt info;

h.  Email from Scott Carlson re Receipt of 7/24 transaction;

i.  Email from Scott Carlson re Ringneck RT;

j.  Email from Scott Carlson re Hartford fax;

k.  Email from Scott Carlson re Registration: Kyler Connell: Signature required;

l.  Email from Scott Carlson re 2012 Claims & balances (personal);

m.  Email from Scott Carlson re medco (personal);

n.  Email from Scott Carlson re Statement of Earnings Details (personal);

o.  Email from Scott Carlson re pension (personal);

p.  Email from Scott Carlson re pension (personal);

q.  Email from Scott Carlson re cash balance plan (personal);

r.  Email from Scott Carlson re Support and Training Services;

s.  Email from Scott Carlson re Hartford fax;

t.      Email from Scott Carlson re Hartford fax;

u.      Email from Scott Carlson re Departure memo regarding returning WFS propriety info and equipment (personal);

v.      Email from Scott Carlson re Welcome to Copytalk's Mobile Scribe Service; and

w.      Email from Scott Carlson re Revised Mortensen Documents (personal).

*Id*.

Some of the files described above related to Carlson's personal finances, such as his pension and his cash plan.  (Carlson Aff. ¶ 13).  Other files related to other Woodbury matters, described by Carlson as follows[1]:

a.      The email regarding "eagle circle" showed the detailed report of what was sold per representative.  Carlson was paid differently on several lines and he needed to know what was sold.

b.      The email regarding "rep contact information" was necessary to print because Carlson was paid differently per state, and he needed to have a clear listing of the states in which his representatives were located.

c.      The email regarding "Year Over Year GDC" showed how the territory was doing without any representative information to evaluate how Carlson was doing during the year.

---

[1] Carlson cannot be exact about some of these emails because he does not have them to review.  As he states in his affidavit, he has deleted the emails and cannot access them. There is simply no way he can "irreparably harm" Hartford with emails he does not have and cannot access.

d.      The email regarding "list of reps" may be the same thing as item b above.  Carlson cannot remember.

e.      Carlson does not recall the email regarding "ms3."

f.      The email regarding "Securities Registrations" may have related to Carlson's review of compliance responsibilities;

g.      The email regarding "Hunt Info" and "Ringneck RT" related to a roundtable meeting of representatives that Carlson was planning and preparing for in November;

h.      The "Hartford Fax" emails may have related to a personal medical reimbursement request Carlson was going to make in connection with his medical reimbursement plan;

i.      The "Kyler Connell" email related to getting a new agent into active status.  He needed a signature in order to get registered and thus, Carlson needed it printed so he could sign it.  This was to help a representative become a Woodbury representative, not become a representative of another company;

j.      The "Claims and balances" and "Medco" emails related to Carlson's personal medical claims for 2012 in connection with his medical reimbursement plan;

k.      The "Statement of Earnings" was simply Carlson's paycheck;

l.      The emails regarding "pensions" and "cash balances" related to Carlson's pension and cash balance plans at Woodbury;

m.     The email regarding "departure" related to Woodbury's request that Carlson return his equipment and he wanted to have a hard copy printout of Woodbury's request.  After he received this request, he boxed up his hardware, including his computer, his docking station, his screen, his projector, his printer, his cell phone, and any other pertinent data that he could find at that moment.  He sent the box to Woodbury.  Then, Woodbury contacted Carlson's new employer and asked if he had sent everything.  He went back and found six boxes of hard copy records that had accumulated over 20 years of employment and that had to do with Woodbury.  He shipped that to Allianz for purposes of tendering the materials to Woodbury.  He forgot he had the USB device.  When he discovered that he had it, he turned it over to his legal counsel.  It largely contains the same information that he previously had turned in to Hartford.

n.     The "Copytalk" email was a mobile scribe service and dealt with how to use Copytalk;

o.     The "Mortensen" document related to Carlson's work with one of the clients he personally advises.

(*Id*).

After the emails were printed, Carlson deleted the files from his home email and the personal computer that he used to receive and print them.  (*Id*).  He tendered any hard copies that were printed to his new employer, Allianz's legal team, for purposes of tendering them to Hartford.  He did not retain any copies, electronic or otherwise.  (*Id*).  To the best of Carlson's knowledge, he did not delete the emails from the Woodbury

computer he was using to send them.  (Carlson Aff. ¶ 15).  Even if he had done so,
Woodbury would have a backup copy.  (*Id*).  Carlson returned the emails identified
above, regardless of whether or not they contained any Confidential Information.
(Carlson Aff. ¶ 16).

Carlson has no knowledge of other emails sent to his personal email address in late
July of 2012 relating to Hartford that have not been deleted.  (Carlson Aff. ¶ 17).  Carlson
cannot harm Hartford with these emails.  He does not have possession of them, cannot
use them, and has not used them.  (Carlson Aff. ¶ 18).

2.      Redtail

During Carlson's employment with Hartford, he had access to Redtail, which is an
independent third-party storage website.  (Carlson Aff. ¶ 19).  Woodbury encouraged its
employees to carry out a "paperless" initiative.  (*Id*).  This initiative involved eliminating
the use of paper files for clients and representatives and using electronic storage so the
file materials could be accessed from remote locations other than the home office, which
is where the physical files would be otherwise located.  (*Id*).  This initiative also provided
protection of files and information in the event of a disaster.  (*Id*).  Redtail was an
approved data storage website that facilitated, in part, Woodbury's paperless initiative.
(*Id*).

Prior to the end of Carlson's employment, while in Wisconsin, he completed
audits on certain representatives over whom he had the responsibility for supervising.
(Carlson Aff. ¶ 20).  Carlson wanted to submit those audits to the home office
compliance department in a timely fashion so that the representatives would not be

adversely affected if Carlson was terminated for his failure to agree to the restrictive non-solicitation requirements. (*Id*). Carlson submitted the audits to Woodbury in keeping with Woodbury's supervisory procedures. (*Id*). Carlson faxed the documents to Woodbury's headquarters and from there, they were uploaded to Redtail by office personnel. (*Id*). They were not uploaded to Redtail by Carlson himself.

Carlson has no need for the audits uploaded to Redtail. (Carlson Aff. ¶ 21). Carlson does not intend to use the audits in any fashion and he has not done so. (*Id*). Carlson has made it clear in his responses to Hartford's demand that he does not have any intention of retaining access to any registered representative documents through Redtail. (*Id*). In fact, Carlson has already deleted any documents on Redtail that relates to a registered representative. (*Id*). Since then, Hartford has disconnected Carlson's access to Redtail, and therefore, he has no present ability to access any information relating to Hartford via Redtail. (*Id*).

3. <u>USB Device</u>

Carlson acknowledged that he possessed a USB device that contained certain files related to Hartford on it in correspondence written by Carlson's counsel dated August 24, 2012. (Carlson Aff. ¶ 22; Doc. 13-1, pg. 30). Carlson's legal counsel currently possesses the USB device for safekeeping and in connection with Carlson's duty to preserve electronically stored information in connection with this case. (*Id*). In correspondence dated August 24, 2012 to Hartford's counsel, the files on USB device were described as including (a) production data of representatives who worked with Carlson (which was the same material attached to the emails discussed above), and (b) securities records relating

to clients Carlson personally advises.  (Carlson Aff. ¶ 24).  In the letter, Carlson informed Hartford that he had no intention of keeping the production data of representatives who worked with him and he offered to destroy any such file and certify with an affidavit that he has done so.  (Carlson Aff. ¶ 25).  Carlson advised Hartford that he intended to keep the securities records relating to the clients that he personally advised and any human resources data that pertains to him.  (*Id*).  After Hartford found this unacceptable, and persisted in its threats to litigate, Carlson's legal counsel sent a second letter dated August 27, 2012, in a further effort to resolve the dispute.  (Carlson Aff. ¶ 27, Ex. 1).

In the August 27, 2012 correspondence, Carlson offered an affidavit that included the following as an attempt to resolve the dispute:

    a.    Carlson would sign an affidavit that he has made a diligent search of any "Confidential Information" as said term is defined in the "Employee Confidentiality and Work Product Ownership Agreement" executed by Carlson on March 27, 2001;

    b.    Carlson would specify in the affidavit that he searched:

        i.    Any and all personal email addresses Carlson presently has control over or had control over since his departure from Hartford;

        ii.    Any email address Hartford wanted him to specify;

        iii.    His work email address at his new place of employment;

        iv.    Any USB storage devices in his possession or control on which any data relating to Hartford may have been saved;

    v.      Any home computer and hard drive in his possession or control;

    vi.     Any other electronic storage device in his possession or control on which data relating to Hartford may have been saved;

    vii.    For any paper or hard copy records pertaining to Hartford or Woodbury that he may have possession or control over.

c.    Carlson informed Hartford that he wanted to keep only human resources records pertaining to him and securities records relating to clients he personally advises, which information Woodbury has <u>routinely</u> permitted representatives to retain upon their departures from employment.

d.    Carlson would include in the affidavit that he has, to the best of his knowledge, made all efforts known to him to:

    i.      permanently delete;

    ii.     permanently destroy,

    iii.    return to Hartford, or

    iv.    provide to his new employer, for the purpose of destroying or returning to Hartford, Confidential Information, if any, found as a result of his search whether such information was stored electronically or otherwise.

      e.      Carlson would acknowledge in the affidavit that he will not otherwise knowingly retain any Confidential Information.

      f.      His affidavit would specify that he will not otherwise knowingly share with or disclose to any person or entity any information that was deleted, destroyed, or returned to Hartford or his employer as described above.

      g.      He would provide in the affidavit that he has not knowingly provided any information discussed above that he has deleted, destroyed or returned to Hartford or his employer, to any person or entity other than his employer.

(Carlson Aff. ¶ 28).

Further, Carlson informed Hartford that he would agree to put his computer and electronic devices up for a forensic examination so that a third party could examine them, confirm the deletion or destruction of files, and identify other potential files, if any, that need to be deleted or destroyed.  (*Id*).  Carlson offered to pay for the cost of the examination.  (*Id*).  Hartford, however, refused these offers and filed its lawsuit.  (Carlson Aff. ¶ 29).

Carlson cannot cause Hartford harm in connection with the USB device.  (Carlson Aff. ¶ 30).  He does not have possession of it as he provided it to his attorneys.  (*Id*).  Carlson only proposed to retain his personal client information pertaining to the clients that he personally advises.  (*Id*).  This information would include their names, addresses, phone numbers and their account numbers and balances.  (*Id*).

Hartford claims Carlson deleted files off of Woodbury's system, but any files placed on the USB drive would remain on Woodbury's computer system even if Carlson deleted them from the Woodbury computer he was using.  (Carlson Aff. ¶ 31).  As with the emails discussed above, Woodbury's computer system backs up everything and a person in Carlson's position cannot permanently or irretrievably delete anything such that is is non-recoverable.  (*Id*).

4.    <u>Registered Representative Contact Information</u>

Carlson signed a Confidentiality Agreement with Hartford many years ago. Confidential Information is defined in that agreement as "information that is not generally known outside of The Hartford and is of significant value to The Hartford …. This obligation shall continue for as long as the Confidential Information remains unavailable to the general public through legal and proper means."  (Doc. 9, pp. 8-9).

To the extent there was registered representative <u>contact information</u> contained in the emails forwarded to Carlson's personal email address, on the USB drive, or uploaded to Redtail, such information is readily available elsewhere and is not confidential. (Carlson Aff. ¶ 36).  For example, a representative's company name, CRD (Central Registration Depository) number, address, and phone number are all available through any broker dealer's account with a subscription service called FMG or "Discovery." (Carlson Aff. ¶ 37).  The FMG program provides all the information on the representatives and can even be organized and sorted by certain parameters.  Search terms can be inputted into FMG and it will print a list of all Woodbury registered representatives.  (*Id*).  This information, therefore, is not confidential, and is available

elsewhere.   Attached as Exhibit 3 to Carlson's affidavit is a true and correct copy (redacted) of information printed using FMG to prepare a list of Woodbury registered representatives.  (*Id*).  The list is redacted to remove personal information.  (*Id*).  All of this information is also available on the FINRA website www.FINRA.org at the "FINRA BrokerCheck" link.    (*Id*).   Accordingly none of this type of information would be confidential.   (Carlson Aff. ¶ 38).  *See Avidair Helicopter Supply, Inc. v. Rolls-Royce Corporation*, 663 F.3d 966, 975 (8th Cir. 2011).

In any event, Carlson no longer has the Hartford emails because they have been deleted.   To the extent there was any representatives' names or contact information contained on the USB drive, Carlson has made no use of that information, does not intend to keep it, and will return the USB drive to Hartford.  (Carlson Aff. ¶ 39).  To the extent there is any representatives' names or contact information uploaded to Redtail, Carlson has already indicated that he has no use for such information and has deleted it.  (Carlson Aff. ¶ 40).

5.    Registered Representative Financial and Performance Information

Hartford claims Carlson inappropriately took financial performance information pertaining to the representatives.  (Carlson Aff. ¶ 41).  Carlson did not do so. (*Id*).  In fact, Woodbury provided Carlson, <u>after</u> he left employment, with verification of his pay. (*Id*).  It emailed that information to him at his home email address and it included a list of all representatives working under him, what they produced month and year to date, and how he was paid based upon their performance.  (*Id*).  Carlson knows what his pay scale is based upon the representatives' sales, so the information Woodbury provided after he

left employment, is the same information that Woodbury is claiming that he inappropriately took before he left employment. (*Id*). None of this information was surreptitiously taken.[2]

To the extent that there was registered representative performance or production information on the emails forwarded to Carlson's home address, the emails have already been deleted and he does not have copies. (Carlson Aff. ¶ 43).

To the extent there is any registered representative performance or production data on the USB drive, Carlson has already informed Hartford that he has made no use of that information, he will not keep it. (Carlson Aff. ¶ 44). If any registered representative performance or production information existed on Redtail, Carlson has already deleted this information. (Carlson Aff. ¶ 45).

6.    Information Carlson Desires to Retain

Carlson wishes to retain certain non-confidential information. This information includes his personal information. This information contains no significant value to Hartford and includes items related to Carlson's personal finances, such as his pension and his cash plan. These items are not confidential information and thus, Carlson should be permitted to retain said information.

Carlson also advised Hartford that he intended to keep the personal production records relating to the clients that Carlson personally advised. (Carlson Aff. ¶ 28).

---

[2] The email that Woodbury sent has been printed and provided to legal counsel in connection with the duty to preserve evidence in this case and he does not have the printout in his possession. He has no objection to returning it to Woodbury. (Carlson Aff. ¶ 42).

Carlson has knowledge of several Regional Vice-Presidents who, when they departed, Hartford made no claims that the Vice-President's personal clients belonged to it. (Carlson Aff. ¶ 32).  Carlson had advisory relationships with many of these clients <u>prior</u> to his employment at Woodbury, so the client files would belong to him regardless. (Carlson Aff. ¶ 33).

### B.    Hartford's Requested Relief

#### 1.    <u>Return Confidential Information</u>

Hartford seeks an Order requiring Carlson to return information.  With the exception of Carlson's human resources information and his personal clients, Carlson has either returned, destroyed or offered to return anything that is confidential.  (See Carlson Aff. ¶¶ 9-45).

#### 2.    <u>Submit to Interviews</u>

Hartford seeks an Order requiring Carlson to submit to interviews, under oath, with Hartford's Investigative Services and Information Protection teams.  None of this is warranted by the confidentiality agreement or the facts of this case.

#### 3.    <u>Produce UBS Device, Emails and Computers</u>

 Hartford requests that Carlson produce the USB device, the emails, and his computers to Hartford.  None of this is warranted by the confidentiality agreement or the facts of this case.  Hartford fails to identify or provide any authority to support its complete and total access to Carlson's said electronic and storage devices.  Instead, the use of a neutral third-party to examine computer forensics is preferred.  *See Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645 (D.Minn. 2002).  As discussed above, the

USB is currently in the possession of Carlson's counsel and he is ready, willing and able to produce it to Hartford.

### 4.   Identify Non-Confidential Information Carlson is Entitled to Retain

Carlson has identified the non-confidential information that has the right to retain and possess to Hartford, which includes his personal human resources data and information relating to his personal clients.  As discussed above, Carlson is permitted to retain this non-confidential information.

### 5.   Submit Sworn Certificates

Hartford requests that Carlson submit sworn certificates that Carlson has deleted or returned all Confidential Information to Hartford and possesses no additional Confidential Information belonging to Hartford and that Carlson did not and will not use such Confidential Information.  As discussed above, Carlson has already told Hartford he would do this.  He offered an affidavit regarding this.

Hartford asserts that Carlson provided false statements in a written certification he previously gave.  Carlson believed that he returned everything.  Upon identification of the USB drive, he immediately offered a return of anything that could possibly be confidential.

## II.   STANDARD FOR GRANTING MOTION FOR PRELIMINARY INJUNCTION

When evaluating whether to issue a preliminary injunction, a district court should consider four factors, including "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict

on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

In balancing the four factors, no single factor is determinative. *Id* at 113. "A court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id*. "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Industries Corporation v. The Clorox Company*, 140 F.3d 1175, 1179 (8th Cir. 1998). "A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).

## III.   ARGUMENT

### A.   Hartford is not entitled to injunctive relief.

1.   <u>Hartford does not have a strong likelihood of succeeding on the merits of its contract claims against Carlson.</u>

Hartford alleges breach of a contract that provides for Connecticut law to apply.[3] "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Meyers v. Livingston, Adler, Pulda, Maiklejohn and Kelly, P.C.*, 134 Conn.App. 785, 790

---

[3] The Employee Confidentiality and Work Product Ownership Agreement states, "This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut. (Johnson Dec., Ex. A).

(2012) (citations omitted).    Pursuant to Minnesota law, "A claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." *Zinter v. University of Minnesota*, 799 N.W.2d 243, 245 (Minn.App. 2011) (citations omitted). Further, a breach of contract claim fails as a matter of law if the plaintiff cannot establish that he has been damaged by the alleged breach. *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578-79 (Minn.App. 2004).  Regardless of which law applies, Hartford must prove that Carlson's breached a provision of the Confidentiality Agreement and that such breach caused damages.

Hartford's breach of contract claim fails because there is no proof that Carlson is refusing to return information that is actually confidential.  He has made perfectly clear that he does not have the emails or the Redtail files.  He wants to keep nothing on the USB drive that relates to registered representatives.  The only information he wants to keep is the data on his own personal customers, and that information would not be confidential such that it can provide the basis for a breach of contract claim.

Woodbury has routinely permitted Regional Vice Presidents to depart employment and take their clients with them.  (Carlson Aff. ¶ 32).  Moreover, Woodbury is a signatory to the "Protocol for Broker Recruiting" (the "Protocol") that allows brokers to take client lists with them when they change firms.  (Carlson Aff. ¶ 34, Ex. 2).  Regarding the Protocol:

> The Protocol is a securities industry agreement that allows departing brokers to immediately solicit the clients they served with their former employer if they

follow the terms of the Protocol, notwithstanding the terms of any employment agreement that they may have signed. Pursuant to the terms of Protocol, the departing broker may only take the following account information from the clients he serviced at his former firm: the client's name, address, phone number, email address, and account title. The departing broker is prohibited from taking any other documents or information. If the terms of the Protocol are followed, the departing broker may solicit his former clients after the termination of his employment with his former firm.

*Morgan Stanley & Co. Incorporated v. Choy*, 2009 WL 330210, *2 (D. Hawaii, Feb. 10, 2009) (internal citations omitted).

Carlson expects Hartford will claim that Carlson's new employer has not signed the Protocol, and as a result, the Protocol is irrelevant. However, in *Merrill Lynch v. Brennan*, 2007 WL 632904, *2 (N.D.Ohio, Feb. 23, 2007), the defendants left employment with Merrill Lynch (a signatory to the Protocol) for employment with Bear Stearns (a non signatory):

In essence, the Protocol allows brokers, under certain conditions, to bring client lists with them when transferring firms. Although Bear Stearns is not a signatory to this agreement, Merrill's signature indicates that they understand the fluid nature of the industry; brokers routinely switch firms and take their client lists with them. By setting up a procedure for departing brokers to take client lists, Merrill tacitly accepts that such an occurrence does not cause irreparable harm.

*Id*. Therefore, as a signatory to the Protocol, Hartford cannot legitimately complain that

Carlson's departure with this data is either a contractual breach or an example of irreparable harm. Hartford cannot legitimately claim Carlson is in breach of the Confidentiality Agreement in with respect to this information.

Similarly, Hartford cannot base a breach of contract claim on Carlson's possession of contact information for the registered representatives because that information is readily available elsewhere. The Confidentiality agreement that Carlson signed only applies to "information that is not generally known outside of The Hartford and is of significant value to The Hartford…" (Doc 9 pp. 8-9). As discussed above, through a program like FMG, Carlson and any other registered representative can easily pull up a list of Woodbury's or any other broker/dealer's representatives at any time.

Hartford next claims that Carlson was and is in possession of statistical or performance data concerning the registered representatives that is not generally known outside of Hartford. That type of information is not, *per se*, a violation of the Confidentiality Agreement if Carlson has it. For example, nothing would prevent a registered representative from communicating on his own volition, his performance data to a prospective employer. In that instance, the performance and statistical information would have been lawfully obtained from another source – the prospective representative.

At best, Hartford would have to show that Carlson is unlawfully possessing or using an internal Woodbury document containing this information if it is going to show a breach of his confidentiality agreement. Hartford tries to make out that case based on (a) the emails, (b) the Redtail files and (c) the USB drive that relates to the registered representatives. But Carlson has made very clear that (a) the emails are deleted, (b) the

Redtail files have been deleted, and (c) he will delete or destroy any representative information on the USB drive.   There is no proof that he is still possesses, intends to keep, or has used in any way, an internal Woodbury document for any purpose whatsoever.   Hartford simply cannot show a likelihood of success on the merits of a breach of contract claim.

Another element of a breach of contract claim requires proof of damage caused by a breach.   Hartford makes no such showing.   Carlson has returned or deleted anything confidential, and he has offered to return anything confidential that is on the USB drive. Under these circumstances, Hartford can claim no damage caused by anything Carlson did or did not do.   Indeed, Hartford has come forth with no evidence that Carlson is using confidential information to Hartford's detriment, and Carlson has made it clear both before this lawsuit and now, that he intends to keep no information that is confidential.

In support of its assertion that Hartford will be successful on its contract claim, Hartford relies upon *Vascular Solutions, Inc. v. Pedregon*, No. 09-2089, 2009 WL 2743022, *6 (D. Minn., August 26, 2009).   This case is distinguishable.   In *Vascular Solutions*, the former employee had a non-solicitation and a non-compete agreement. Carlson does not.   The former employee in *Vascular Solutions* did in fact compete in violation of his non-compete agreement.   The same cannot be said for Carlson.   The former employee in *Vascular Solutions* failed to clearly state in his response to the injunction motion that he was not soliciting former customers, whereas Carlson has clearly stated he intends to keep nothing that is confidential.   The *Vascular Solutions* case does not advance Hartford's argument.

Hartford also cites *Prudential Ins. Co. of America and Pruco Securities, LLC v. Sandvold*, 2012 WL 245161, *1 (D. Minn. Jan. 25, 2012). The former employee in *Prudential* outright refused to return proprietary information and did not allow Prudential's information technology specialist to access his computers. *Id.* Carlson, on the other hand, has never refused to return anything confidential, he has told Hartford he will do so, and he has proposed further assurances in the form of an affidavit and a forensic examination of his computer and other hardware.

Next, Hartford cites *Wells Fargo Investments, LLC v. Bengtson*, 2007 WL 2007997, *1 (D.Minn., July 9, 2007). In that case, the Court concluded that Wells Fargo demonstrated a likelihood of success on the merits for its breach of contract claim because the defendant <u>solicited customers in violation of a non-solicitation agreement</u>. These facts are inapplicable because Carlson did not have a non-solicitation agreement with Hartford.

Finally, Hartford cites *ATS Logistics Services, Inc. v. Lorenzo*, 2004 WL 2944108, *6 (D.Minn., Dec. 17, 2004). In that case, the former independent contractor tried to claim he could keep information collected while he was affiliated with the employer. The contractor sent out an unauthorized facsimile to all of the employer's shippers and carriers that was misleading, and the contractor was using the employer's protected trademarks. The contractor also refused to stop identifying himself with the employer's trademark. As such, the court found injunctive relief appropriate. But Hartford has pointed to no conduct on the part of Carlson that is even remotely close to the conduct of the former contractor in *ATS*. Beyond Carlson's personal information and

his personal client information that Hartford has never claimed is confidential either in separations with other representatives or in connection with the Protocol, Carlson has not asserted that he is entitled to keep any of the other information.

Hartford has failed to cite any authority that supports its position.  It has failed to make a showing that it is likely to succeed on the merits of a breach of contract claim.

2.   <u>Hartford Has Made No Showing Of A Likelihood Of Success On its Conversion Claim</u>.

Connecticut law provides, "the tort of conversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." *Marinos v. Poirot*, 132 Conn.App. 693, 702 (2011) (internal citations and quotations omitted).  Minnesota law is basically the same, "the elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest." *Rydrych v. GK CAB Co., Inc.*, 2011 WL 5829337, *4 (Minn.App., Nov. 21, 2011) (citations omitted).

Carlson has either deleted all that is confidential, returned it to Hartford or offered to return it to Hartford.  There has been no conversion because there is no deprivation of any property interest.  Hartford makes the wholly unsubstantiated assertion that "Defendants' returned boxes of documents and electronic files that demonstrate conversion and that more information is missing." (Doc., 9, pg. 26).  No evidence is offered to suggest anything else is "missing."  No evidence is offered to suggest Carlson is using any information that is confidential and it is therefore baseless for Hartford to claim that, "The value The Hartford derived from the exclusive use and confidentiality of

this Information is being diminished each day the Information is not returned and secured." (Doc. 9, pg. 26).

Hartford has failed to demonstrate a substantial likelihood of success on the merits of its conversion claims and the Court should deny its motion for temporary restraining order in its entirety.[4]

3.    Hartford will not suffer irreparable harm.

Hartford will not suffer irreparable harm if the Court does not enjoin Carlson from certain actions.  In order to meet this factor, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Prudential Ins. Co. of America and Pruco Securities, LLC v. Sandvold*, 2012 WL 245161 (D.Minn. Jan. 25, 2012).  To the contrary, the absence of a finding of irreparable injury is alone sufficient ground for denying a preliminary injunction.  *Dataphase*, 640 F.2d at 114, n. 9.  *See also Guy Carpenter & Company, Inc. v. John B. Collins Associates, Inc.*, 179 Fed.Appx. 982 (8th Cir. 2006) (Court denied motion for preliminary injunction because the movant failed to show irreparable injury).

Carlson has provided this Court with an affidavit that states he surrendered, deleted and never used any and all of Hartford's Confidential Information.  This is not the same situation as the cases Hartford relies upon where the former employee violated a non-solicitation agreement, failed to return confidential information and/or was actively soliciting customers or spreading confidential information.  Therefore, Hartford will not

---

[4] Hartford also asserts claims for replevin, breach of fiduciary duty, and trade secrets. Hartford failed to address these claims in its Memorandum of Law and these claims should not be considered by this court in connection with Hartford's motion.

suffer irreparable harm if the Court denies the Motion.

Further, Hartford cannot assert that it will irreparably harmed by Carlson taking his personal clients that he had an advisory relationship prior to his employment at Woodbury.  (Carlson Aff. ¶ 33).  Pursuant to the Protocol, which is described above, a broker may switch firms and take their client lists with them.  By setting up this procedure, Hartford "tacitly accepts that such an occurrence does not cause irreparable harm. *Merrill Lynch v. Brennan*, 2007 WL 632904, *2 (N.D.Ohio, Feb. 23, 2007).

Hartford claims that it might somehow be damaged by Carlson in connection with the sale of its subsidiary, Woodbury.  However, any allegations of damage associated with Woodbury's sale are entirely speculative and do not constitute irreparable harm that is capable of supporting an injunction claim.

A failure to establish irreparable harm is fatal to a request for a preliminary injunction.  *Local Union No. 884 v. Bridestone/Firestone, Inc.*, 61 F3d 1347, 1357 (8th Cir. 1995).   When the possible harm is speculative only, it cannot be called irreparable harm.  *Id.* at 1355.  A threat of irreparable harm that is too distant and speculative will not warrant preliminary relief.  *Coteau Properties Co., v. Dept. of Interior*, 53 F.3d 1466, 1484 (8th Cir. 1995); see also *Columbia Transit Corp., v. Jones*, 572 F.2d 168, 173 (8th Cir. 1978) (when a party demonstrates that a problem is potential only, it has failed to demonstrate irreparable harm.)  Finally, the injury must be both certain and great; it must be actual and not theoretical.  Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time.  The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear

and present need for equitable relief to prevent irreparable harm.  *Packard Elevator v. Interstate Commerce Commission*, 782 F.2d 112, 115 (8th Cir. 1986).

There are several problems with Hartford's claims.  First, Hartford has not offered into evidence any provision of the sale agreement between AIG Advisors Group, Inc. and Woodbury.  As such, the court and Carlson can only speculate about how the purchase price is determined.  They can only speculate about how the sale price could possibly be impacted by anything Carlson does or did following the ending of his employment.

Second, neither the buyer (AIG) nor the seller (Woodbury) are parties to this case, and it appears that Hartford, a non-party to the agreement, has no standing and is not the real party in interest to assert a claim for any damages that are tied to Woodbury's selling price.

Third, the most that Hartford provides about the purchase price is that it is based on "a number of criteria" including "the annualized gross dealer concession attributable to Reps working with Woodbury."  (Johnson Declaration, Doc 10, pg 7).  None of what Johnson says in his declaration is explained or substantiated with provisions from the agreement that determine the purchase price.  No specifics are given.  If Johnson's words have something to do with representatives that might leave Woodbury, it is important to note that Carlson does not have a non-compete or a non-solicitation agreement.  This means that it is entirely possible for a representative to leave Woodbury and join Carlson's new company without Carlson being in breach of any duty or obligation owed to Hartford.  Any other interpretation would be tantamount to imposing a non-competition clause on Carlson when none otherwise exists.

Hartford has produced no evidence that Carlson has used confidential information in a way that has resulted in a representative making a decision to leave Hartford and join Allianz. In fact, Hartford has offered no evidence that any representative has even left. Without any such evidence Hartford has made no claim of irreparable harm. Any claimed harm that relates to the sale of Woodbury is unproven, and entirely speculative.

Hartford cites case law to support its claim of irreparable harm, but the cases involve entirely different facts. In *Hypro LLC v. Reser*, No. 04-4921, 2004 WL 2905321, *5 (D.Minn., Dec. 10, 2004), defendant was using the plaintiff's confidential and proprietary information in the marketplace to gain an unfair advantage. There is no evidence that Carlson has done this.

Hartford asserts that it is entitled to injunctive relief because it is explicitly provided in the Confidentiality Agreement. (Doc. 9, pg. 29). In *Merrill Lynch v. Brennan*, 2007 WL 632904, *2 (N.D.Ohio, Feb. 23, 2007), the defendants signed contracts stating, "I further consent to the issuance of a temporary restraining order of a preliminary or permanent injunction to prohibit the breach of any provision of this contract...." and "I consent to the issuance of a temporary restraining order or a preliminary or permanent injunction...." Despite the existence of these contracts, the Court held that plaintiff was not entitled to a temporary restraining order. *Id*. at *3.

Hartford relies upon *Wells Fargo Investments, LLC v. Bengtson*, 2007 WL 2007997 (D.Minn., July 9, 2007) to assert that it may be damaged by its client relationships and its inability to safeguard confidential information. (Doc. 9, pp. 27-28). In *Wells Fargo*, the former employee violated the non-solicitation provision of his

employment agreement by soliciting Wells Fargo customers that became known to him during his employment. *Id.* Carlson has done nothing of the sort.

*American Airlines, Inc. v. Imhof and Delta Airlines, Inc.*, 620 F.Supp.2d 574, 578 (S.D.N.Y. 2009), contains a factual pattern similar to this case. In *American Airlines*, Imhof sent American documents to his family email address and downloaded other American documents prior to ending his employment with American to begin employment with Delta. American, once it learned that Imhof took this information, immediately demanded that Imhof case working for Delta and sought injunctive relief preventing Imhof from working at Delta. *Id.* at 578.

Similar to this dispute, Imhof offered to return or destroy all copies of the information that he received. *Id.* at 790. Further, Delta made it clear that it would not receive any of these materials from Imhof. *Id.*[5] Under these circumstances, the Court found no material risk that Imhof would retain copies of the documents, much less disclose them. *Id.* (emphasis added). As a result, the Court held that American failed to establish the requisite threat of irreparable harm regarding the documents and information taken by Imhof. *Id.* at 580. The same result should be reached here because Hartford has asserted nothing that demonstrates a material risk. There is no evidence of use of any confidential information.

On a related note, Hartford alleges that it will be filing an arbitration against Defendants. Courts have long recognized that arbitration is an expeditious way to

---

[5] Carlson's current employer does not want any of the alleged Confidential Information. As acknowledged by Hartford, "Allianz has stated that it does not want or expect Defendants to use Hartford's Confidential Information." (Doc. 9, pg. 33).

conduct litigation.  *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 682 n.7 (8th Cir. 2001) quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (by agreeing to arbitrate, a party trades the courtroom "for the simplicity, informality, and expedition of arbitration.").   Therefore, given that Hartford will not suffer irreparable harm and has an expeditious manner to conduct litigation, which alleges will be filed, the request for injunctive relief should be denied.

4.    <u>The balance of harms does not demonstrate that Hartford will suffer much greater harm if the injunction is not granted</u>.

The next factor, "balance of harms," also warrants denial of Hartford's motion. *See Dataphase*, 640 F.2d at 114 (the third factor is the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties).   The "balance of harms" analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id*.

An illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992).   The potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F3d 1466, 1473 (8th Cir. 1994).

Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action.   *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F2d 484, 489 (8th Cir. 1993).   Where the non-movant has

taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a preliminary injunction." *Id.* at 490.

Here, Carlson has taken substantial steps to assure Hartford that he does not have, has not used, and will not use, any confidential information. The harm to Carlson in the negative perceptions about him that will surely be generated by an injunction far outweighs any perceived harm that Hartford attempts to fabricate here. There is no showing that the purchase price of Woodbury is lower because of anything related to Carlson. The injunction would thus confer no benefit upon Hartford, but any injunction will impose significant detriment on Carlson.

Hartford relies upon *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F.Supp. 1258, 1282 (N.D.Ill. 1997), for the premise that "the injunction will only prohibit defendants from engaging in illegal conduct." However, in *IDS Life Ins. Co.*, the defendants were engaging in "systematic raiding of plaintiffs for their agents and plaintiffs' customers, customer assets and trade secrets." *Id.* at 1281. None of these facts are present in this case.

Hartford has simply failed to show that it will face irreparable harm prior to the matter being resolved through arbitration, considering that Carlson has offered a reasonable remedy to the dispute. *See Davis v. Francis Howell School District*, 104 F.3d 204, 207 (8th Cir. 1997). Carlson will be harmed if Hartford's request for an injunction

is granted.  An injunction will hinder Carlson's further employment prospects and cause him significant emotional distress, financial loss, and loss of credibility with his current clients.  (Carlson Aff. ¶ 8).  This lawsuit has also limited Carlson's ability to be appointed to insurance companies and to obtain financing or credit at financial institutions.  (*Id*).  An injunction may require a disclosure on his securities license and also on any future appointments with insurance companies.  (*Id*).  Furthermore, it will likely impact relationships with new representatives and hinder his ability to make such relationships.  (*Id*).

5.     <u>The public interest weighs in favor of not granting the injunction.</u>

The final factor in the *Dataphase* analysis is the impact of granting or denying the preliminary injunction upon the public interest.  *Dataphase*, 640 F.2d at 114. The public has no interest in having its courts enter extreme remedies when those remedies will not remedy any identifiable wrong.  *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) (no showing that the public interest would be served by the relief.)

As to the personal clients that Carlson advises, Woodbury is a signatory to the Protocol and it has routinely permitted representatives to depart and continue serving their clients.  Woodbury thereby recognizes that it is in the public interest that financial services clients be able to continue to do business with representatives that they know and trust.  As such, it would be in the public interest to not preclude Carlson from continuing to service his clients.

As to the registered representative data on the USB drive, Carlson has made it

34

clear that he has no intention of keeping this information.  The representatives' contact information is available through other sources and there is no non-compete arrangement in place between Carlson and Hartford.  Therefore, if this factor weighs in favor of either party with respect to this type of information, it would weigh in favor of Carlson because the public interest would not be furthered by ordering injunctions that will be perceived or construed as a non-competition or non-solicitation order. The parties never bargained for that, and Hartford should not be permitted to force that result anyway through the injunction process.

## IV.    BOND.

No injunction is appropriate.  Should any injunction be awarded (and Carlson denies it should be) the bond would need to be substantial because of the substantial damage that would result to Carlson as a result of it being imposed, and Carlson reserves the right to submit supplemental materials on the subject of the bond amount in that instance.

## V.    CONCLUSION

For the foregoing reasons, Carlson requests that this Court enter an Order denying Hartford's Motion for Temporary Restraining Order, Preliminary Injunction and Expedited Discovery.  (Doc. Nos. 7-14).

Dated this 12th day of September 2012.

Scott Carlson, Defendant,


By: *s/James F. Cann*
    James F. Cann, *pro hac vice pending*
    KOLEY JESSEN P.C., L.L.O.,
    One Pacific Place, Suite 800
    1125 South 103rd Street
    Omaha, NE  68124-1079
    (402) 390 9500
    (402) 390 9005 facsimile
    James.Cann@koleyjessen.com

And
    *s/Jonathan M. Harris*
    Jonathan M. Harris
    Harris Law
    Union Plaza
    333 Washington Ave. N.
    Suite 300
    Minneapolis, MN 55401
    (612) 349-9890
    (612) 349-2760 facsimile
    jmh@jmharrislaw.com

Attorneys for Defendant.

## CERTIFICATE OF SERVICE

On this 12th day of September, 2012, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system and sent the same by email to the following:

Patrick R. Martin
Jody Ward-Rannow
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN 55402
pat.martin@ogletreedeakins.com
jody.ward-rannow@ogletreedeakins.com

Attorneys for Plaintiff

J. Jeffrey Deery
C. Andrew Roy
Ryan P. Scordato
Winderweedle, Haines, Ward & Woodman, P.A.
390 N. Orange Avenue
Suite 1500
P.O. Box 1391
Orlando, FL 32802-1391
jdeery@whww.com
aroy@whww.com
rscordato@whww.com

Attorneys for Defendant Corrigan

Kevin F. Woodall
Woodall Law Offices
580 California Street, 16th Floor
San Francisco, California 94104
kevin@kwoodalllaw.com

Attorney for Defendant Cairns

*s/Jonathan M. Harris*
Jonathan M. Harris

667725.5